AIR PRODUCTS AND
CHEMICALS, INC.

v.

HARTFORD ACCIDENT AND
INDEMNITY CO., et al.

Civ. A. No. 86–7501.

United States District Court,
E.D. Pennsylvania.

Feb. 21, 1989.

Richard H. Albert, Stephen S. Ferrara, Law Dept. Air Products and Chemical Co., Allentown, Pa., Jerald Oshinsky, Sherry W. Gilbert (adm. pro hac vice), Washington, D.C., for plaintiff.

Peter F. Marvin, Edward M. Dunham, Jr., Philadelphia, Pa., for Aetna Cas. & Sur. Co.

John C. Sullivan, Philadelphia, Pa., Gerald V. Weigle, Jr., Stephen G. Schweller, Cincinnati, Ohio, for Liberty Mut. Ins. Co.

John M. Fitzpatrick, Philadelphia, Pa., John P. Arness, Beth P. Gesner, George W. Mayo, Washington, D.C., for Hartford Acc. & Indem. Co.

S. Gordon Elkins, Samuel J. Arena, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for Travelers Ins. Co.

Edwin L. Scherlis, Edward T. Connelly, Philadelphia, Pa., for Nat. Union Fire Ins. Co. of Pittsburgh, Pa.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

This is an indemnification and contribution action involving several insurance companies which have issued liability insurance policies to plaintiff Air Products and Chemicals, Inc. (Air Products) or its former subsidiary, Exomet, Inc. (Exomet). Presently pending are motions for summary judgment filed by plaintiff and four other parties.

### I. *Background*

Air Products manufactures and sells electrical arc welding products. From 1967 to 1979, Air Products owned Exomet, which manufactured and sold insulation products containing asbestos and heat-treating kits containing asbestos insulation materials. This action arises from several hundred personal injury lawsuits, of two distinct types, that have been filed against Air Products and Exomet. The first category, the underlying welding lawsuits, involves claims alleging bodily injury resulting from exposure to fumes and gases from welding rods sold by Air Products. The second category, the underlying asbestos lawsuits, involves alleged injuries resulting from exposure to Exomet's asbestos products[1].

Air Products commenced this action on December 24, 1986 by filing a complaint against defendants Hartford Accident and Indemnity Company (Hartford) and Liberty Mutual Insurance Company (Liberty). Air Products named Aetna Casualty and Surety Company (Aetna) as a defendant in its amended complaint filed in June 1987. Air Products seeks declaratory relief concerning the application of general liability insurance policies issued by Aetna, Hartford, and Liberty to the underlying asbestos and welding personal injury lawsuits brought against Air Products and Exomet. Aetna was Air Products' primary liability insurance carrier from May 16, 1951 to June 8,

---

1. At oral argument, counsel for Air Products stated that there were 85 pending welding lawsuits filed against Air Products, involving approximately 1,876 claimants, and that 47 such lawsuits have been "closed." Air Products has assertedly paid over $20,000 in settlements, and has incurred defense costs of over $570,000. Counsel also stated that there 70 pending and 267 closed asbestos lawsuits, involving an aggregate of approximately 1,300 claimants and defense costs of over $170,000. Transcript of Oral Argument at 5–6.

1953. Hartford was Air Products' liability insurance carrier from June 1, 1953 through September 30, 1972. Hartford added Exomet[2] to Air Products' policy on December 12, 1967. Liberty was Air Products' carrier from September 30, 1972 through September 30, 1978. Liberty insured Exomet under its policies with Air Products. The plaintiff also seeks damages for the breach of defendants' defense and indemnification obligations under their respective policies with Air Products.

The plaintiff's complaint has created a small industry of cross-claims, counterclaims, and third and fourth party actions. The defendants have each filed indemnification and contribution cross-claims against one another, and have brought third party indemnification and contribution actions against National Union Fire Insurance Company (National), which has insured Air Products from September 30, 1978 through the present, and against The Travelers Insurance Company (Travelers), which purportedly insured Exomet at the time of its acquisition by Air Products in June 1967. National has responded with a fourth party complaint against Air Products, seeking indemnification and contribution pursuant to certain side agreements to its policies with plaintiff. Travelers has filed indemnification and contribution cross-claims against Liberty and National. Finally, Liberty has brought counterclaims against Air Products, seeking damages and declaratory relief in connection with Air Products' alleged breach of certain terms of its Liberty policy.

On April 7, 1988, I denied Traveler's motion for summary judgment. Presently pending are motions for summary judgment filed by all of the other litigants. Counsel have filed excellent, extensive memoranda concerning the pending motions, and have participated in a helpful oral argument. The motions are therefore ripe for adjudication.

## II. *Discussion*

Summary judgment is appropriate if there exists no genuine issue material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery,* 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Ettinger v. Johnson,* 556 F.2d 692 (3d Cir. 1977). The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 252, 106 S.Ct. at 2512. Generally, the construction of a written contract such as an insurance policy is for the court, with the intent of the parties to be determined on the basis of the policy language. *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983); *Mohn v. American Casualty Co. of Reading,* 458 Pa. 576, 326 A.2d 346, 351 (1974).

### A. Air Products' Motion for Partial Summary Judgment

In its motion for summary judgment, Air Products seeks the following rulings on four issues affecting defendants' obligations in the underlying lawsuits: (1) that defendants are obligated to defend plaintiff in the underlying lawsuits, and pay all defense costs, unless and until defendants can show that no portion of the alleged injury process occurred during any of their

---

**2.** As discussed *infra,* Liberty and Hartford dispute that the Exomet covered under their policies is the same Exomet that is now the subject of the underlying asbestos lawsuits.

respective policy periods; (2) that coverage under defendants' policies is triggered if any part of the alleged injury process took place during their respective policy periods; (3) that plaintiff may designate a specific policy, among those triggered, under which an underlying lawsuit is to be handled, and that defendants may not allocate costs among the affected insurance companies in such a way as to impose upon plaintiff any portion of the costs; (4) that for purposes of the retrospective premium adjustment provisions of the Liberty polices, all of the underlying welding lawsuits and all of the underlying asbestos lawsuits constitute single occurrences.

### 1. *Duty to Defend and Trigger of Coverage*

Air Products seeks a declaration that Aetna[3], Hartford, and Liberty (hereafter collectively referred to as the defendants) are each obligated under their policies to defend Air Products, and pay plaintiff's defense costs, in the underlying lawsuits unless these defendants establish, as to a particular claimant, that no portion of the alleged injury process occurred, or could have occurred, during any of its policy periods. Air Products also seeks a ruling that coverage under these defendants' comprehensive general liability insurance policies with plaintiff is triggered if any part of the alleged injury process in the underlying lawsuits took place during the respective defendants' policy periods.

■ An insurer's duty to defend a complaint against an insured arises when "the allegations of the complaint 'state on their face a claim against the insured to which the policy *potentially* applies,'" *C.H. Heist Caribe Corp. v. American Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir.1981), quoting *C. Raymond Davis & Sons, Inc. v. Liberty Mutual Insurance Co.*, 467 F.Supp. 17, 19 (E.D.Pa.1979), even if the allegations are groundless, false or fraudulent. *Gedeon v. State Farm Mutu-*

*al Automobile Ins. Co.*, 410 Pa. 55, 58, 188 A.2d 320 (1963). If a complaint states allegations that "potentially fall within the coverage provided, the insurer is obligated to fully defend its insured until it can confine the possibility of recovery to claims outside the coverage of the policy." *American Contract Bridge League v. Nationwide Mutual Fire Ins. Co.*, 752 F.2d 71, 75 (3d Cir.1985); *see also Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 760 (3d Cir. 1985). Moreover, the insurer must defend the entire claim "if some of the allegations in the complaint fall within the terms of coverage and some do not." *C. Raymond Davis & Sons, supra*, 467 F.Supp. at 19.

■ The insurer has a duty to *indemnify* its insured, on the other hand, only if it is established that the claimant's damages are *actually* within the policy coverage. *C.H. Heist, supra*, 640 F.2d at 483.

■ Thus, to determine the scope of the defendants' duty to defend and indemnify Air Products against the underlying asbestos and welding lawsuits it is necessary to ascertain, with respect to each set of claims, the event triggering coverage under defendants' policies with plaintiff. The so-called "trigger of coverage" provides the standard for determining whether a particular claimant's allegations state a claim potentially or actually covered under a particular defendant's policy.

With respect to the underlying asbestos lawsuits, the parties differ greatly in their positions regarding the appropriate trigger of coverage. Hartford maintains that coverage under its policies is triggered by a claimant's exposure to asbestos products. Liberty argues that the trigger is a claimant's manifestation of asbestos-related illness. Air Products advocates a "continuous" trigger of coverage, arguing that coverage under a particular policy is triggered if any part of the disease process, from exposure through manifestation, occurred during the policy period.

---

**3.** Air Products makes no claims against Aetna with respect to the underlying asbestos lawsuits, as Air Products acquired Exomet in 1967, and Aetna's coverage of Air Products terminated in

1953. Thus, the discussion of Aetna's duties to indemnify or defend Air Products applies only to the underlying welding lawsuits.

I believe that the Third Circuit's decision in *ACandS, Inc. v. Aetna Casualty and Surety Co.*, 764 F.2d 968 (3d Cir.1985), controls the determination of the defendants' duty to defend and indemnify Air Products with respect to the underlying asbestos claims. Applying Pennsylvania law, and interpreting policy language similar to that involved here, the court in *ACandS* held that coverage for claims arising from asbestos-related diseases is triggered if any part of the disease process, from exposure through manifestation, falls within the policy periods. The court considered authoritative the Pennsylvania Superior Court's decision in *Vale Chemical Co. v. Hartford Accident and Indemnity Co.*, 340 Pa.Super. 510, 490 A.2d 896, 901–02 (1985), *vacated on other grounds*, 512 Pa. 290, 516 A.2d 684 (1986), which adopted this standard. The state court

> reasoned that, in the context of a disease with a long latency period, the term " 'bodily injury' ... simply lack[s] the precision necessary to identify a point when the physical damage or debility occurred so as to determine adequately at which time coverage was triggered." [*Vale*, 490 A.2d] at 901. Thus it followed *Keene* [*Corp. v. Insurance Co. of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) ], which interpreted " 'bodily injury' to mean any part of the single injurious process that asbestos-related diseases entail." *Keene*, 667 F.2d at 1047.

764 F.2d at 972–73.

The defendants argue that because the Pennsylvania Supreme Court vacated the Superior Court's decision in *Vale*, the theoretical basis of the *ACandS* holding has been undermined and that decision may no longer be considered an authoritative statement of the law. However, the same argument was made, and rejected, in *Pittsburgh Corning Corp. v. Travelers Indemnity Co*, Civ. No. 84–3985 (E.D.Pa. January 20, 1988), [1988 WL 5301] and *Reading Co. v. The Travelers Indemnity Co.*, Civ. No. 87–2021 (E.D.Pa. Feb. 18, 1988) [1988 WL 13242]. Judge Giles noted in those decisions that although the Supreme Court vacated the lower court's decision in *Vale*, it did so on jurisdictional grounds, without reaching the merits. Therefore, the Superior Court's reasoning is "still persuasive as a predictor of Pennsylvania law." *Id.*, at 3–4. Moreover, as both Judge Giles and the Third Circuit have noted, *id.*, at 4, n. 1; *ACandS, supra*, 764 F.2d at 973, other Pennsylvania courts which have addressed this issue have supported the *Vale* approach. *See Techalloy Co. Inc. v. Reliance Insurance Co.*, 338 Pa.Super. 1, 487 A.2d 820, 825–26 (1984); *Crown Cork & Seal Co. v. Aetna Casualty & Surety Co.*, No. 1292, Slip Op. (Com.P. August 2, 1983).

■ The situation with respect to the underlying welding lawsuits is somewhat different. The applicability of the continuous trigger of coverage to claims asserting welding fume-related diseases is apparently an issue of first impression, as neither the parties nor the court have been able to locate a reported decision on this subject. Further, as defendants point out, the medical evidence concerning the nature and progression of welding fume diseases is certainly not as expansive as that pertaining to asbestos-related diseases. Indeed, the only medical evidence in the present record are physicians' affidavits submitted by Liberty and Hartford. These affidavits state that the medical literature on the effects of exposure to welding fumes is not conclusive, but that the associated diseases may range from acute to chronic, and from merely irritating to life threatening.

In contrast, *ACandS*, and the other decisions discussing the appropriate trigger of coverage in product exposure cases, have dealt with asbestos-related diseases or other latent illnesses whose etiology and disease processes are, if not uniform, comparatively well-researched and well-known. *See, e.g., Keene Corp. v. Insurance Company of North America*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (asbestos-related diseases); *Lac D'Amiante Du Quebec v. American Home Insurance*, 613 F.Supp. 1549 (D.N.J.1985) (asbestos-related diseases); *Owens–Illinois, Inc. v.*

*Aetna Casualty & Surety Co.,* 597 F.Supp. 1515 (D.D.C.1984); *Vale, supra,* (DES-related diseases). *Eli Lilly & Co. v. Home Insurance Co.,* 482 N.E.2d 467 (Ind.1985) (DES-related diseases).

Defendants argue that the scarcity of medical evidence concerning the nature and progression of welding fume diseases precludes summary judgment for plaintiff on the trigger of coverage issue as to the underlying welding lawsuits. Defendants assert that welding fume related diseases may take a variety of forms, most of which are assertedly acute, rather than latent or chronic[4]. According to defendants, decisions such as *ACandS* are therefore inapposite, as these decisions are founded on medical evidence establishing the latency of the diseases at issue.

I disagree. The Third Circuit in *ACandS* noted that the district court ruled in favor of the continuous trigger "without a medical record, citing *Keene* for the proposition that 'the details of asbestos diseases and their development are not relevant to the issues at bar.' 576 F.Supp. 936, 938 n. 3." 764 F.2d at 972. The court considered that Pennsylvania's subsequent adoption in *Vale, supra,* of the district court's reasoning required it to "reject defendants' argument that summary judgment was inappropriate without factual determinations concerning the details of asbestos-related disease." 764 F.2d at 973.

I believe that *ACandS* requires application of the continuous trigger to the underlying welding lawsuits. It may be, as defendants contend, that exposure to fumes causes a wide assortment of medical disorders, most of them acute in progression and brief in duration. However, this fact does not take the force out of the *ACandS* holding. For claims arising from acute disorders, the selection of the appropriate trigger of coverage is largely an academic exercise. If manifestation of illness occurs at or about the time of the individual's exposure to fumes, then the defendants' duty to indemnify or defend remains the same whether an "exposure," "manifestation," or continuous trigger of coverage applies.

However, in the case of claims alleging *latent* welding fume diseases, the reasoning in support of the application of the continuous trigger in the asbestos context is directly analogous. The differences in the disease processes among the welding fume disorders, or between those disorders and the latent asbestos- and DES-related diseases involved in *ACandS* and *Vale,* do not serve to distinguish those cases. The relevant facts supporting the application of the continuous trigger of coverage are simply that "the diseases develop long after exposure" to plaintiff's products, and that plaintiff "can be held liable for their occurrence." *Keene,* 667 F.2d at 1038, n. 3.

Accordingly, I conclude that under Pennsylvania law, defendants have a duty to defend those underlying asbestos and welding lawsuits in which the claimants allege exposure to plaintiff's products, exposure-in-residence[5], or manifestation of asbestos- or welding fume-related disease within their respective policy periods, unless and until these defendants can confine the possibility of recovery to claims outside the coverage of their respective policies.[6] These defendants have a duty to indemnify

---

**4.** The defendants' medical experts stated that the majority of welding fume related disorders are acute, with manifestation of disease symptoms occurring at or about the time of exposure. However, Hartford's expert acknowledged that respiratory disorders associated with exposure to welding fumes may be either acute or chronic, and that the medical literature discusses a "speculative" link between welding fumes and certain lung cancers. Declaration of Kenneth H. Chase, M.D., Attachment A to Hartford Memo. in Opposition to Plaintiff's Motion for Partial Summary Judgment.

**5.** As defined in *ACandS,* "exposure-in-residence" constitutes the period between exposure to asbestos and manifestation of asbestos-related disease. 764 F.2d at 971.

**6.** Of course, the defendants' duty to defend and indemnify is ultimately restricted by the limits of the defendants' policies with Air Products. "If, at the outset of a particular action, it is properly established that the insurer cannot possibly be liable for indemnification because policy limits have been exhausted," then there is no duty to defend that action under Pennsylvania law. *ACandS,* 764 F.2d at 975.

the plaintiff for those underlying claims in which any part of the claimant's injury process, from exposure to manifestation, are shown to have occurred during their respective policy periods.

### 2. Designation of Policy and Allocation of Costs

The plaintiff asserts that it is entitled to designate a specific policy, among those triggered, under which an underlying lawsuit is to be handled. The plaintiff further argues that defendants may not allocate costs among the affected insurance companies in such a way as to impose upon plaintiff any portion of the costs. I shall address each of these contentions in turn.

### a. Designation of Triggered Policy

█ The insured's right to designate a particular triggered policy for coverage was addressed in *ACandS*. The district court there held that the insured may designate a particular policy under which a claim is to be defended, which may be different from the policy under which the insured will seek indemnification. The Third Circuit vacated this portion of the declaration "insofar as it assumes that, in a case in which coverage under more than one policy has been triggered, ACandS may designate a particular policy for full indemnification." The court's holding in this regard was without consideration of the possible effect of the "other insurance" provisions of the affected policies. The court further vacated the lower court's declaration insofar as it "grants ACandS the power to bifurcate the duty to defend from the duty to indemnify." 764 F.2d at 975. The court based its ruling on the well-settled principle of insurance law that the "duty to defend a covered action implies the right to defend such an action." *Id.* A subsequent state court decision discussed the designation of a particular policy for coverage in the continuous trigger context. The court in *J.H. France Refractories Co. v. Allstate*

*Insurance Co.*, No. 3933, February Term, 1981 (Phila.Ct.Comm.Pleas April 18, 1986), *vacated on other grounds*, 372 Pa.Super. 575, 539 A.2d 1345[7], *petition for allocatur granted* 519 Pa. 663, 548 A.2d 253 (1988), agreed that liability among triggered policies "should be apportioned chronologically and seriatim." Slip op. at 13. The court noted that each insurer was obligated to defend any personal injury suit arising during its policy period, and to pay "all sums" for judgments and settlements, up to its policy limits. The court continued:

> Because of the "all sums" language, if only one policy was activated, that insurer would owe the insured the duty to defend and indemnify until "the applicable limit of the company's liability has been exhausted by payments of judgments or settlements" This is true if any "bodily injury" occurs during the policy period.

> · · · · ·

> The duty to defend activates at least at the same time as the duty to indemnify. Each insurer is fully liable for defense and its costs until its indemnity obligation has been fulfilled. See *Wilson v. Maryland Casualty Co.*, [377 Pa. 588], 105 A.2d 304 (Pa.1954). Therefore, the insurer whose policy is activated first must defend and indemnify the insured until the applicable limit is exhausted. Upon exhaustion, the next-in-time insurer must defend and indemnify until its limit is exhausted. This test is to be applied to determine which carrier must defend the insured and when.

Slip op. at 14–16. I believe that the *J.H. France* ruling constitutes the best statement of Pennsylvania law concerning the designation of a triggered policy for coverage in a particular underlying action, and I adopt it here. Accordingly, I will deny plaintiff's motion insofar as it seeks the unfettered right to designate a triggered policy for coverage.

**7.** The Pennsylvania Superior Court, on the authority of *Vale Chemical Company v. Hartford Accident and Indemnity Co.*, 512 Pa. 290, 516 A.2d 684 (1986), vacated the lower court's decision in *J.H. France* for failure to join an indispensable party. As was the case with the Superior Court's decision in *Vale* itself, however, I do not believe that the appellate court's procedurally-based action affects the cogency of the lower court's state law analysis.

**770**

### b. Allocation of Costs

■ In addressing the allocation of losses among triggered policies, the *ACandS* court held that "subject to the possible effect of 'other insurance' clauses, there is no proration of losses under a policy once coverage is triggered." The court explained:

> The policies require the insurers to pay all sums which ACandS becomes "legally obligated to pay" because of bodily injury during the policy period. It is uncontested that under principles of tort law ACandS may be held fully liable for a personal injury plaintiff's damages caused in part by ACandS' asbestos during a particular period, even through plaintiff's damages may also have been caused, in part, at other times. It follows that if a plaintiff's damages are caused in part during an insured period, it is irrelevant to ACandS' legal obligations and, therefore, to the insurer's liability that they were also caused, in part, during another period.

764 F.2d at 974 [citations omitted].

Both *ACandS* and *J.H. France* expressly reserved ruling on the effect of the insurers' "other insurance" clauses in determining the allocation of liability [8]. Under Pennsylvania law, "other or double insurance exists only where there are two or more insurance policies covering the same interest, the same subject matter, and against the same risk." *Blue Anchor Overall Co. v. Pennsylvania Lumbermens Mutual Insurance Co.*, 385 Pa. 394, 400, 123 A.2d 413, 415 (1956). In this case, the defendants' general liability policies are,

under this standard, "other insurance" as to other triggered policies, as they cover the same interest, subject matter, and risk in the underlying asbestos and welding lawsuits. An insurer that pays out on an underlying claim is thus entitled under its "other insurance" clause to contribution from the insurance companies that issued other triggered policies, the amount of contribution to be pro-rated according to the limit of the insurers' respective policies. *Liberty Mutual Insurance Co. v. Pacific Indemnity Co.*, 579 F.Supp. 140, 143 (W.D. Pa.1984); *Insurance Company of North America v. Continental Casualty Co.*, 431 F.Supp. 316, 319 (E.D.Pa.1977), *rev'd on other grounds*, 575 F.2d 1070 (3d Cir.1978) (INA).

However, Air Products argues that its insurers may not allocate liability under "other insurance" provisions so as to impose any defense or indemnity costs upon the plaintiff. Air Products thus seeks to prevent defendants from allocating liability to insurers, such as Liberty and National, whose policies contain deductibles, retrospective premium provisions, or side indemnity agreements.

In interpreting the "other insurance" provisions, I am mindful of my obligation to provide a liberal interpretation of the respective policies in favor of coverage of the insured. *See Hensley v. Life Insurance Company of North America*, 551 F.2d 35 (3d Cir.1977); *Pittsburgh Bridge & Iron Works v. Liberty Mutual Co.*, 444 F.2d 1286 (3d Cir.1971); *INA, supra*, 431 F.Supp. at 318. In the absence of controlling caselaw dealing with the application of

---

**8.** Liberty's clause is representative of the defendants' "other insurance" provisions. In relevant part, this clause states:

> When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:
>
> (a) Contribution by Equal Shares If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share of

each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid. (b) Contribution by Limits If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

"other insurance" provisions in the continuous trigger context, I believe that the district court's decision on remand in *Keene* provides the most well-reasoned basis for resolving this issue.

The courts in *Keene* and *ACandS* held that, subject to "other insurance" provisions, each triggered policy would be required to respond in full to the insured's losses. *Keene*, 667 F.2d at 1048. *ACandS*, 764 F.2d at 973. In *Keene*, as here, the insured's later policies contained large deductible and administrative fee provisions limiting the insurers' liability for product exposure claims.

On remand, the district court in *Keene* stated:

Nothing in the Court of Appeals decision indicates that Keene is entitled to be relieved of its contractual obligations to pay the deductibles in the post–1976 Liberty policies. Rather, the decision indicates that one insurance policy is to cover a single asbestos-related injury and Keene may select the policy to be applied. Therefore, if Keene selects one of the post–1976 Liberty policies under which it is to be indemnified, Keene is obligated to pay the deductibles....

However, Keene is not obligated to pay these deductibles if it selects one of the pre–1976 policies under which it is to be indemnified ... The Court of Appeals decision would be controverted if Keene selected a pre–1976 policy under which to be indemnified but was then assessed a share of the liability for the injury through the "other insurance" clauses based on the deductible provisions in the post–1976 Liberty policies. "[T]he 'other insurance' provisions of each policy provide a scheme by which *the insurers' liability* is to be apportioned." [667 F.2d] at 1050. (emphasis added). As an insured, Keene cannot be assessed liability under these circumstances. Furthermore, the Court of Appeals decision

stressed that "the primary duty of the insurers whose coverage is triggered by exposure or manifestation is to ensure that Keene is indemnified in full." *Id.* Therefore, if post–1976 Liberty policies are triggered but Keene selects a pre–1976 policy under which to be indemnified, Keene shall not be assessed any portion of the liability by way of the deductible provisions of the triggered post–1976 Liberty policies. Keene's share of the liability in these cases will be apportioned among all of the insurers whose policies are triggered pursuant to the "other insurance" clauses.

*Keene Corp. v. Insurance Company of North America*, No. 78–1011 (D.D.C. May 13, 1983), slip op. at 9–12. I adopt this approach here, with the reservation that Air Products does not have the discretion to select a particular triggered policy for coverage. Rather, as discussed above, the policy covering a specific claim (covering policy) is to be determined in accordance with the principles set forth in *J.H. France, supra.*

For the above reasons, I hold that the carrier that issued a covering policy may not, pursuant to its "other insurance" provision, allocate liability among other carriers in such a way as to impose liability on plaintiff, whether by means of deductibles, retrospective premiums, or side indemnity agreements [9]. I further hold that if a covering policy contains such a provision, the provision is to apply on its face as to plaintiff, and the insurers are then to allocate their respective liability for the loss pursuant to their "other insurance" clauses. *Pacific Power & Light Co. v. Transport Indemnity Co.*, 460 F.2d 959, 962 (9th Cir. 1972); *Keene*, slip op. at 12.

3. *Number of Occurrences for Purposes of Retrospective Premium Provisions*

■ Under endorsements to each of Liberty's policies with plaintiff, Air Products

---

9. I am unpersuaded by the contention of Hartford and Liberty that for purposes of allocation of liability, the retrospective premium, corridor deductible, and side indemnity agreements are to be treated differently than the standard deductible at issue in *Keene*. Despite their different structures, all of these provisions have the identical effect of allocating liability for underlying lawsuits to the insured. Thus, for purposes of allocation of liability pursuant to "other insurance" clauses, the *Keene* analysis is applicable to all of these provisions.

is required to pay Liberty retrospective premiums based on the claims made against Liberty's policies. These premiums (or "retros") are calculated on the basis of "ratable incurred losses." Under Liberty's general liability policies, ratable incurred losses arising out of a single occurrence are limited in the relevant policy years to amounts from $50,000 per occurrence to $200,000 per occurrence. The plaintiff seeks a ruling that *all* of the underlying welding lawsuits and *all* of the underlying asbestos lawsuits each constitute a single "occurrence" for purposes of the Liberty's retro provisions. Liberty responds that the underlying asbestos and welding lawsuits allege injuries resulting from a variety of causes. Thus, Liberty asserts, it may properly compute its retros on the basis of multiple "occurrences."

The Liberty policies in effect during the 1972–75 policy years define "occurrence" as:

> an accident, including injurious exposure to conditions, which results in "bodily injury" neither expected not intended from the standpoint of the insured.

The 1975–78 policies define "occurrence" as:

> an accident, including continuous or repeated exposure to conditions, which results in "bodily injury" neither expected nor intended from the standpoint of the insured.

Liberty's policies further provide that:

> For the purpose of determining the limit of the company's liability (1) all personal injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions ... shall be considered as arising out of one occurrence.

The Third Circuit in *Appalachian Ins. Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56 (3d Cir.1982), interpreted roughly equivalent Liberty policy language [10] when it held that a single discriminatory practice that led to multiple employment discrimination claims constituted a single occurrence

for purposes of the policy's deductible retention provisions. The court stated:

> The general rule is that an occurrence is determined by the cause or causes of the resulting injury. " ... [T]he court asks if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries or damage.' " [citations omitted].

> Applying the general rule to the facts of this case we agree ... that there was but one occurrence for purposes of policy coverage. The injuries for which Liberty was liable all resulted from a common source: Liberty's discriminatory policies ...

> The fact that there were multiple injuries or that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence. [citation omitted]. Indeed, the definition of the term "occurrence" in the Appalachian policy contemplates that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over a period of time.

676 F.2d at 61.

The *Appalachian* holding does not directly control my determination of the number of occurrences for purposes of the Liberty retros. As Liberty strenuously maintains, the unitary discriminatory policy involved in *Appalachian* is more obviously a single "cause" of the claimants' injuries than the product exposure which generated the underlying asbestos and welding lawsuits here. Further, in its later discussion of when the occurrence took place for policy purposes, the *Appalachian* court expressly reserved decision on whether the principles it announced were applicable to "litigation involving coverage of defendants involved in the asbestos litigation." 676 F.2d at 62, note 14.

However, to determine the number of occurrences for purposes of the retro provisions, *Appalachian*'s holding requires an inquiry into the cause of the claimants'

**10.** *See Appalachian,* 676 F.2d at 59, note 8.

alleged injuries. The causal inquiry supports the view that the claims in the underlying asbestos litigation and the claims in the underlying welding litigation each arise from single occurrences—the continuing manufacture and sale by plaintiff of the products involved in each set of lawsuits.

The court in *Owens–Illinois v. Aetna Casualty and Surety Co.,* 597 F.Supp. 1515 (D.D.C.1984), addressed the number-of-occurrences issue in the product exposure context. The court there held that for purposes of the insurer's per-occurrence deductible, the manufacture and sale of the plaintiff's asbestos product constituted a "single occurrence." In language that speaks to the present case, the court stated:

> [T]he policies' definition of occurrence and unifying definitional principles focus on the cause of injury. Therefore, the Court's inquiry is whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages. *E.g., Appalachian, supra,* 676 F.2d at 61. Analysis should focus on "the underlying circumstances which resulted in the claim for damages." *Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502, 505–06 (2d Cir.1976). Here, the underlying circumstance that gave rise to the claims for damages was O–I's [Owen–Illinois] manufacture and sale of a hazardous asbestos containing product. O–I was insuring against its liability for personal injuries arising out of its products. O–I's liability in the underlying suits is premised on the claimants' submission of proof that among the asbestos fibers that he [sic] inhaled was an asbestos fiber from O–I's "Kaylo." [citation omitted]. It is undisputed that all suits brought by all claimants share a common feature: each claimant alleges at least one exposure to O–I's asbestos-containing product.

597 F.Supp. at 1527. *See also Champion, supra* (one occurrence where multiple claims resulted from sale of defective panelling); *Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.,* No. 85 C 8519 (N.D.Ill. Feb. 10, 1987) [1987 WL 6611] (Attachment 8 to Air Products' Memo.) (one occurrence where multiple claims resulted from sale of plumbing system); *Cargill, Inc. v. Liberty Mutual Insurance Co.,* 488 F.Supp. 49 (D.Minn.1979), *aff'd,* 621 F.2d 275 (8th Cir.1980) (one occurrence where sale of defective chemicals resulted in multiple claims); *Union Carbide Corp. v. Travelers Indemnity Co.,* 399 F.Supp. 12 (W.D.Pa.1975) (same).

Liberty asserts that there were multiple occurrences in both the underlying asbestos and the underlying welding litigation, pointing out that the claimants' alleged injuries resulted from exposure to a number of asbestos and welding products, that the claimants' exposure occurred under a variety of conditions, and that different claimants allege different injuries. At a minimum, Liberty contends, the differing factual circumstances of each claim and the need to probe the parties' intent as to application of the retros precludes summary judgment on the occurrences issue.

■ However, the relevant facts for summary judgment on this issue are the terms of the Liberty policy, the fact that claimants allege injuries as a consequence of exposure to plaintiff's products, and the fact that plaintiff can be held liable for these injuries. *Owens–Illinois, supra,* 597 F.Supp. at 1526. As in the above cited cases, the claimants suffered "multiple injuries ... of different magnitudes ... extend[ing] over a period of time." *Appalachian, supra,* 676 F.2d at 61. However, in both the underlying asbestos litigation and the underlying welding litigation, the claimants' alleged injuries resulted from a single proximate cause—the continuing sale of the plaintiff's asbestos-containing products and welding products. An examination of the policy language, and the large per-occurrence ratable incurred loss limit, supports the conclusion that the parties reasonably intended that the retros were to be calculated on the basis of a single occurrence characterization of personal injury claims arising from the manufacture or sale of a its asbestos and welding products.

*Id.*, at 1526–27 [11].

### B. Other Parties' Motions for Summary Judgment

#### 1. *Aetna's and Hartford's Liability for pre–1962 Welding Claims*

 Aetna and Hartford contend that they have no defense or indemnification obligations under their policies with Air Products with respect to welding claims arising before 1962. The basis for their contention is the following stipulations by Air Products:

> Air Products has never engaged in the manufacture of arc welding consumables.

> Air Products believes, based on reviewed records and the recollection of present and former employees, that Air Products never sold welding consumables until approximately 1962, when for the first time, Air Products became a reseller of such consumables; as a reseller, Air Products purchased the arc welding consumables from several manufacturers and distributors and in turn resold them.

Aetna, construing these stipulations as an admission by Air Products that it did not sell welding rods before 1962, argues that these statements relieve it from all liability in this case, as it last insured Air Products in 1953, many years before Air Products began selling arc welding materials. Similarly, Hartford contends that it has no liability with respect to pre–1962 welding claims.

As stated above, the insurer's duty to defend is broader than its duty to indemnify. Pennsylvania law provides that an insurer has a duty to defend its insured whenever allegations against the insured state a claim to which the policy potentially applies. *C.H. Heist, supra,* 640 F.2d at 479; *C. Raymond Davis & Sons, supra,*

467 F.Supp. at 19; This obligation exists even if the allegations are "groundless, false or fraudulent," *American Contract Bridge League, supra,* 752 F.2d at 75, quoting *Gedeon supra,* 410 Pa. at 58, 188 A.2d 320, and it persists until the insurer "can confine the possibility of recovery to claims outside the coverage of the policy." *Id.*

Despite Air Products' present belief that it did not sell welding rods before 1962, a number of the pending welding complaints contain allegations that state a claim potentially within the coverage of pre–1962 policies. According to Aetna's own survey of 259 pending welding lawsuits against Air Products (and other defendants), 27 lawsuits specifically allege exposure to welding fumes during Aetna's policy years. As is often the case in multi-defendant product exposure actions, the plaintiffs' pleadings are generally vague as to dates of exposure to the products of a particular defendant. However, in at least one instance, a welding claimant testified at his deposition that he recalled being exposed to Air Products welding rods in the 1950s.

The parties dispute the nature and significance of the welding claimants' allegations concerning exposure to plaintiff's products before 1962. However, it is clear that at least some of the pending claims are potentially within the scope of coverage of pre–1962 policies. I am unpersuaded by Aetna's and Hartford's assertion that plaintiff's stipulation concerning its sale of arc welding consumables relieves them of liability for pre–1962 claims. Leaving aside the qualified language of plaintiff's stipulation, it is indeed possible that a particular pre–1962 claimant could successfully refute Air Products' position regarding the date when it first began selling welding rods. However, even if the pre–1962 claims are meritless, Air Products is still entitled to

---

**11.** Hartford and Liberty argue that if the court finds a single occurrence for retro purposes, it must find that only one policy's coverage limit applies to each category of underlying cases. I disagree. The plaintiff may not "stack" the coverage limits of the triggered policies in order to increase the limit applicable to a particular underlying claim. However, the insurers' obligation to pay "all sums" to which the plaintiff becomes liable allows the plaintiff to look to each triggered policy to provide full coverage of a particular claim, subject to policy limits and deductible provisions. *Keene, supra,* 667 F.2d at 1049; *ACandS, supra,* 576 F.Supp. at 942; *J.H. France, supra.*

the realization of its reasonable expectation that Aetna and Hartford would defend it against even false and groundless claims arising during their respective policy periods. *American Contract Bridge, supra; Gedeon, supra.* I will accordingly deny Aetna's and Hartford's motion as to the pre–1962 welding claims.

### 2. Hartford's and Liberty's Liability for Underlying Asbestos Claims

Both Liberty and Hartford assert that they have no obligation with respect to the underlying asbestos lawsuits brought against Air Products' former subsidiary Exomet, arguing that the Exomet insured under their policies with Air Products is not the same Exomet which is the subject of the underlying asbestos lawsuits.

Their position arises from the following events in Exomet's corporate history. The original corporate entity, Exomet, Incorporated ("Exomet I"[12]), was an Ohio corporation founded in 1947. In June 1967, X.O. Corporation, a recently formed, wholly owned subsidiary of Air Products, acquired substantially all of the assets of Exomet, Incorporated, and thereafter changed its name to Exomet, Incorporated ("Exomet II"). Exomet I then changed its name to "Rickpay, Inc." Hartford added Exomet II as an insured on its policy with Air Products on December 12, 1967. Liberty insured Exomet II by amendatory endorsement to its policies with Air Products. In June 1979, Exomet II sold the use of its name and the assets and business of its mill/foundry and heating treating operations (which involved the manufacture and sale of asbestos products giving rise to the underlying asbestos lawsuits) to a newly-formed, wholly owned subsidiary of Foseco, Inc. named Exomet, Inc. ("Exomet III"). In that transaction, Foseco and Exomet III expressly refused to accept any of Exomet II's tort liability. Under the terms of the purchase agreement, Air Products and Exomet II (renamed "SNG Corporation") agreed to be "solely responsible for [product liability] claims arising out of occurrences prior to the time of closing." In December 1986, Air Products dissolved SNG Corporation.

Hartford and Liberty now claim that they cannot be held liable under their policies with Air Products for claims arising out of asbestos products manufactured or sold by Exomet II before July 16, 1979, when Exomet II's assets were sold to Foseco/Exomet III. Both defendants argue that Air Products remains liable for the Exomet II claims solely because it retained tort liability under the purchase agreement with Foseco and Exomet III. Because they were not parties to that agreement and did not otherwise agree to cover liability contractually assumed by Air Products, defendants assert, they cannot be held liable for claims arising from Exomet II's activities.

Liberty's and Hartford's arguments in support of their attempt to escape liability for the Exomet asbestos claims are unavailing. It is undisputed that both companies insured Exomet II under their policies with Air Products, and that the underlying asbestos lawsuits allege exposure to Exomet II products or manifestation of injury during the defendants' policy periods. Thus, the liability arising from Exomet II's asbestos products, which was retained by Air Products and Exomet II under the purchase agreement, was the liability covered under the Hartford and Liberty policies. The cases cited by defendants dealing with the contractual assumption of liability by an insured are inapposite. The liability was not created by that agreement, nor was it otherwise contractually created by plaintiff. The purchase agreement simply made explicit the traditional corporate law rule that a corporation that purchases the assets of another corporation does not necessarily assume the seller corporation's liabilities. *Mooney Aircraft Corp. v. Foster*, 730 F.2d 367, 371 (5th Cir.1984); *Travis v. Harris*, 565 F.2d 443, 446 (7th Cir.1977); Fletcher, Cyclopedia of the Law on Private

---

**12.** For the sake of clarity, I will adopt Hartford's nomenclature to describe the various phases of Exomet's corporate history, *see* Hartford Memo. at 27–28, although, for the reasons discussed *infra,* I do not adopt Liberty's or Hartford's position concerning the significance of the above described events in Exomet's past.

Corporations, § 4880. Because Liberty and Hartford have a broad duty to defend claims which are potentially covered by their policies, *C.H. Heist Caribe supra,* 640 F.2d at 481, they remain liable for claims arising from the sale or manufacture of Exomet asbestos products before July 16, 1979 that fall within the periods of their respective policies with Air Products.

As noted, Hartford added Exomet II as an insured on its policy with Air Products on December 12, 1967. Air Products conceded at oral argument that plaintiff is unable to produce endorsements or other evidence to support its position that Hartford's coverage commenced as of the date of Exomet's acquisition. Transcript of Oral Argument at 85–86. Accordingly, I shall grant Hartford's motion as to the pre-December 12, 1967 asbestos claims.

### 3. *Travelers' Liability for Underlying Asbestos Claims*

■ Hartford asserts in its motion for summary judgment that third party defendant Travelers is liable for the underlying asbestos claims because Travelers was Exomet's primary general liability carrier at the time of Exomet's acquisition by Air Products in June, 1967, and this policy was endorsed over to plaintiff. Despite extensive discovery, the parties have not been able to locate the actual insurance policy or the insurance binder. However, in opposition to Travelers' motion for summary judgment, Hartford and Air Products proffered significant evidence concerning the existence, endorsement, and terms and conditions of this policy.

On April 7, 1988, I denied Travelers motion for summary judgment, as this evidence was more than sufficient to create material issues of fact regarding Travelers' potential liability for the underlying asbestos claims. I reserved ruling at that time on the admissibility of this evidence, although it appeared to me then, as now, that much of it would be admissible at trial. Upon review of that evidence, I conclude that the evidentiary support for Hartford's position as to the existence, terms, and

endorsement of the Travelers policy, while strong, is not conclusive enough to warrant the granting of Hartford's motion as to that policy. *See Emons Industries v. Liberty Mutual Fire Insurance Co.,* 545 F.Supp. 185, 187–88 (S.D.N.Y.1982).

### 4. *Air Products' Liability to National*

Third party defendant National has been Air Products' liability insurance carrier from September 30, 1978 to the present. As mentioned above, National's overall liability under its policy with Air Products is affected by a rather unique indemnity obligation undertaken by Air Products. Under the terms of this indemnity agreement, Air Products is required to reimburse National for sums that National pays out under its general liability policies for Air Products' indemnification or defense. As Air Products does not dispute its obligations under its indemnity agreement with National, *see* Plaintiff's Memo. in Support of Motion for Partial Summary Judgment at 11, I shall grant National's Motion for Partial Summary Judgment on its fourth party complaint against Air Products.

### 5. *Liberty's Retrospective Premium Counterclaim*

■ As noted, Air Products' policies with Liberty are subject to retrospective premium provisions. Under these "retro" plans, plaintiff is required to pay Liberty an initial estimated premium under each policy. Thereafter, Liberty annually recalculates Air Products' premiums based upon Air Products' losses under that policy, and then bills plaintiff or credits its account according to this loss history. The recomputation of premiums continues until all claims are liquidated or closed.

At issue in Liberty's retrospective premium counterclaim is Air Products' 1977–78 General Liability policy, which contains a separate retro plan, contained in policy Endorsement 1B, and a separate "corridor" deductible plan, contained in policy Endorsement 1C. The relevant terms of these plans are set out in the margin.[13]

---

**13.** Endorsement 1B provides that the retrospec- tive premium is to be calculated on the basis of

In its motion for partial summary judgment on its retro counterclaim, Liberty seeks the following rulings with respect to the 1977–78 general liability policy.

1. Plaintiff is required to pay all loss amounts falling within the $450,000 corridor deductible.

2. In addition to any losses within the deductible, plaintiff must pay all premium amounts, consisting of the following:

a) a 35% handling charge on all amounts paid within the deductible,

b) retrospective premium, calculated pursuant to Endorsement 1B, comprised of:

i. the first $50,000 of loss per occurrence, *plus*

ii. all allocated expenses associated with that occurrence.

3. The 1977–78 general liability policy is not subject to a maximum premium.

4. The payment by Air Products of actual losses within the $450,000 corridor deductible does not constitute the payment of "premium" counting toward the "maximum premium" asserted by Air Products.

5. Liberty properly billed Air Products a total of $1,426,404.60 for four occurrences involving applications of the corridor deductible and the retrospective premium provisions.

Air Products does not dispute Liberty's entitlement to the rulings sought under

points 1 and 2 [14]. I will therefore grant as uncontested Liberty's motion as to issues 1 and 2 (all parts).

Air Products asserts that the retrospective premiums under its 1977–78 general liability policy is subject to a maximum premium provision. However, unlike the retro plans governing Air Products' preceding general liability policies, Endorsement 1B does not provide for a maximum (or minimum) premium amount [15]. Endorsement 3A to plaintiff's 1977–78 policies, which does restate the maximum and minimum retro provisions, explicitly excludes the general liability policy, and applies only to the workers' compensation, employers' liability and disease, and automobile insurance policies. Air Products resorts to extrinsic evidence that purportedly shows the parties' intention to apply a maximum premium provision to the general liability policy. However, leaving aside the ambiguous nature of this evidence, it cannot provide a basis for reading into the clear and unambiguous provisions of Endorsement 1B a term that does not appear therein. I will therefore grant Liberty's motion as to point 3.

As to the remaining declarations sought by Liberty, my determination that there is no maximum premium provision governing the retrospective premium calculation under the 1977–78 general liability policy makes it unnecessary to reach point 4. Air

---

the first $50,000 of incurred and paid loss for each occurrence, "multiplied by 1.370 and the answer then multiplied by 1.035 tax," *plus* all "allocated loss adjustment expenses." The plan defines "Rateable Incurred Loss" as the sum of the following:
 1. all losses actually paid,
 2. reserves for unpaid losses as estimated by Liberty,
 3. premiums on bonds paid for by Liberty in accordance with the provisions of the policies,
 4. interest accruing after entry of a judgment against the insured,
 5. allocated loss adjustment expenses (attorneys fees and other defense costs), and
 6. expenses in seeking recovery against a third party.
Endorsement 1C describes the "corridor deductible" plan governing the 1977–78 general liability policy. Under this plan, plaintiff is liable for damages falling within a "corridor" amount of "$450,000 for all damages in excess

of $50,000 because of all personal injury and property damage as the result of any one occurrence." Liberty may pay all or part of the corridor amount to settle any claim, with Air Products obligated to reimburse Liberty for any such sums paid. Further, Air Products is also required to pay a premium for the "handling" of deductible losses by Liberty. This "final premium" is "35% of the deductible amounts paid in excess of $50,000 per occurrence."

**14.** Plaintiff's Opposition to Liberty Motion for Partial Summary Judgment at 3; Plaintiff's Response to Supplemental Reply of Liberty at 2, note 1.

**15.** The only reference in Endorsement 1B to a maximum premium is limited to the calculation of retrospective premium in the event of a mid-term policy cancellation by Air Products. The reference is thus inapplicable to the present situation.

Products has not addressed the propriety of the calculations at issue under point 5, pending my determination of the balance of Liberty's motion. I will now afford plaintiff a brief opportunity to address point 5 in light of the principles enunciated in this memorandum.

An appropriate order is attached.

## ORDER

Upon consideration of the motions for summary judgment or partial summary judgment filed by Air Products and Chemicals, Inc. (Air Products), Hartford Accident and Indemnity Company (Hartford), Liberty Mutual Insurance Company (Liberty), Aetna Casualty and Surety Company (Aetna), and National Union Fire Insurance Company (National), the responses thereto, and the parties' memoranda, and for the reasons stated in the attached memorandum, it is ORDERED that:

1. The motion of plaintiff Air Products for partial summary judgment is GRANTED, except as noted in Part II(A)(2)(a) of the attached memorandum.

2. Hartford's motion for summary judgment with respect to the pre-December 12, 1967 underlying asbestos claims is GRANTED, in all other respects, Hartford's motion is DENIED.

3. Aetna's motion for summary judgment is DENIED.

4. Liberty's motion for partial summary judgment with respect to the underlying asbestos claims is DENIED.

5. Liberty's motion for partial summary judgment with respect to its retrospective premium counterclaims is GRANTED as to points 1, 2 (all parts), and 3. Air Products shall respond to point 5 of Liberty's motion within ten (10) days of the date of entry of this order by the clerk's office.

IT IS SO ORDERED.