

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-15-2005

# Liberty Mutl Ins Co v. Treesdale Inc

Precedential or Non-Precedential: Precedential

Docket No. 04-4172

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"Liberty Mutl Ins Co v. Treesdale Inc" (2005). *2005 Decisions.* Paper 604.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/604

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 04-4172

LIBERTY MUTUAL INSURANCE COMPANY

v.

TREESDALE, INC.; PITTSBURGH METALS
PURIFYING COMPANY,

Appellants

Appeal from the United States District Court
for the Western District of Pennsylvania
(Civ. No. 02-cv-02179)
District Judge: Hon. Arthur J. Schwab

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 5, 2005

Before: McKEE, SMITH and VAN ANTWERPEN,
<u>Circuit Judges</u>

(Opinion filed: August 15, 2005)

Frederick J. Francis, Esq.
Beth A. Slagle, Esq.

Gary A. Kern, Esq.
Meyer, Unkovic & Scott
1300 Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Mark D. Shepard, Esq.
Babst, Calland Clements & Zomnir
Two Gateway Center
8th Floor
Pittsburgh, PA 15222

*Attorneys for Appellants*

John C. Sullivan, Esq.
Post & Schell
1600 John F. Kennedy Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA 19103

*Attorney for Appellee*

OPINION

McKEE, Circuit Judge.

Treesdale, Inc., and Pittsburgh Metals Purifying

Company ("PMP")[1] appeal the district court's grant of summary judgment in favor of Liberty Mutual Insurance Company in this declaratory judgment action to determine insurance coverage. The district court adopted a Report and Recommendation that recommended granting summary judgment to Liberty Mutual based upon the Magistrate Judge's conclusion that asbestos-related personal injury claims asserted against Treesdale and PMP are one occurrence under the terms of the disputed insurance policies and that a Non-Cumulation provision in those policies precludes stacking coverage. For the reasons that follow, we will affirm.

## I. FACTS

From approximately 1966 to 1975, Treesdale manufactured and sold a product known as "Soffelex," which contained asbestos. Several thousand asbestos exposure claims have been filed against Treesdale to date. The asbestos claims are typically filed by steel workers who worked in the open hearth part of steel mills and others who claim to have had contact with the open hearth. Treesdale contends that all of those asbestos claims share a common feature – repeated exposure to asbestos and at least one exposure to Treesdale's asbestos-containing product.

Liberty Mutual issued primary liability policies to

---

[1]PMP is a division of Treesdale. For purposes of convenience, both will be referred to as "Treesdale," as that is how the parties define themselves in their briefs.

Treesdale from May 1, 1975 to February 1, 1985. Each of the primary policies Liberty Mutual issued to Treesdale provided policy limits of $500,000 per occurrence, and in the aggregate, for bodily injury. Initially, Liberty Mutual defended and indemnified Treesdale with regard to the asbestos claims pursuant to the primary insurance policies. There is no dispute that each of Liberty Mutual's primary policies has been exhausted by judgments and/or settlements, and that coverage is no longer available under those primary policies.

However, Liberty Mutual also issued Umbrella Excess Liability ("UEL") coverage to Treesdale during the same period.[2] Each of the UEL policies for the period May 1, 1975 to May 1, 1983 provided policy limits of $2,000,000 per occurrence and in the aggregate. The UEL policies for the period May 1, 1983 to February 1, 1985 provided policy limits of $5,000,000 per occurrence and in the aggregate.

When the primary policies were exhausted, Treesdale demanded that Liberty Mutual defend and indemnify it under the UEL policies. Liberty Mutual did so until the district court awarded it summary judgment in this coverage dispute.

The Limits of Liability section of each of the UEL policies states, in relevant part:

> Regardless of the number of insureds under this
> policy or the number of persons or organizations

---

[2]There are ten UEL policies in all.

4

who sustain **personal injury, property damage,** or **advertising injury or damage**,[3] the company's liability is limited as follows:

Each Occurrence[4] – The limit of liability stated in the declarations as applicable to "each occurrence" is the limit of the company's liability for all damages, direct and consequential, because of all **personal injury, property damage,** or **advertising injury or damage** sustained by one or more persons or organizations as the result of any one occurrence.

**\*\*\*\***

For the purpose of determining the limits of the company's liability:

(1) all **personal injury and property damage** arising out of continuous or repeated exposure to substantially the same general conditions . . .

---

[3]Defined terms appear in bold print in the UEL policies.

[4] "Occurrence" is defined in the UEL policies as "injurious exposure to conditions, which results in **personal injury, property damage** or **advertising injury or damage** neither expected nor intended from the standpoint of the insured."

shall be considered as the result of one and the same occurrence.

The Limits of Liability section of each of the UEL policies also contains the following "Non-Cumulation of Liability – Same Occurrence" provision:

> Non-Cumulation of Liability – Same **Occurrence** – If the same **occurrence** gives rise to **personal injury, property damage** or **advertising injury or damage** which occurs partly before and partly within any **annual period** of this policy, each **occurrence** limit and the applicable aggregate limit or limits of the policy shall be reduced by the amount of each payment made by the company with respect to each **occurrence**, either under a previous policy or policies of which this policy is a replacement, or under this policy with respect to previous **annual periods** thereof.

## II. DISTRICT COURT PROCEEDINGS

Liberty Mutual filed the instant action in the district court seeking a declaration that it has no further duty to defend or indemnify Treesdale once it has paid $5 million; the highest limit of liability under any of the UEL policies. Treesdale filed an answer and counterclaim, asserting that Liberty Mutual is obligated to defend or indemnify it under each and every UEL policy until the limit of each and every UEL policy is reached; a total of $26 million in coverage.

6

Liberty Mutual and Treesdale agreed to resolve the declaratory judgment action through cross-motions for summary judgment based on a jointly filed Stipulation of Facts. The Magistrate Judge recommended that summary judgment be granted to Liberty Mutual, finding that the asbestos claims arose from a single occurrence and that the Non-Cumulation provision in the UEL policies precluded stacking policy limits. The district court adopted the R&R and granted summary judgment to Liberty Mutual. This appeal followed.[5]

## III. DISCUSSION

Treesdale makes two arguments in support of its appeal. Each is discussed separately.

### A. A Single Occurrence.

Liberty Mutual contends that all of the asbestos claims arise from a single occurrence, and Treesdale argues that the asbestos claims arise from multiple occurrences, i.e., each claimant's exposure to asbestos. The district court applied the

---

[5]"Disposition of an insurance action on summary judgment is appropriate, when, as here, there are no material underlying facts in dispute." *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 360 (3d Cir. 2004) (citation omitted). "The interpretation of the scope of coverage of an insurance contract is a question of law properly decided by the court, a question over which this court exercises plenary review." *Id.* (citation and internal brackets omitted).

"cause of loss" test to resolve this dispute. It found that the cause of the injury was "the manufacture and sale of the asbestos-containing products." The court held that "the policy language is clear and unambiguous that the injuries arising from this common source must be treated as a single occurrence." Treesdale claims that the district court's holding that all of the asbestos claims arise from a single occurrence was error, and argues that the asbestos claims arise from multiple occurrences – each claimant's exposure to Treesdale's asbestos-containing product.[6]

The essence of Treesdale's argument is that the cause of loss test does not apply to asbestos claims being asserted against an insured in a coverage dispute regarding the number of occurrences.

We first applied the cause of loss test in *Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56 (3d Cir. 1982). There, a class action was filed against Liberty Mutual for sex discrimination based upon certain employment practices instituted Liberty Mutual had instituted in 1965. After the suit was settled, Liberty Mutual sought indemnification from

---

[6]Treesdale does not argue that the applicable policy language is ambiguous and that it is therefore necessary to remand to the district court to resolve that ambiguity. Rather, Treesdale argues that its reading of the language is the only reasonable reading and that Liberty Mutual's reading is unreasonable because the language cannot support Liberty Mutual's interpretation. Reply Br. at 2 n.1.

8

Appalachian, its insurer. Under the applicable policy, Appalachian agreed to indemnify Liberty (subject to certain limitations) for:

> [A]ll sums which the Assured (Liberty) shall be obligated to pay by reason of the liability
> (a) imposed upon the Assured by law.
> \*\*\*\*\*
> for damages on account of: –
> (I) Personal injuries
> \*\*\*\*\*
> caused by or arising out of each occurrence happening anywhere in the world.

*Id.* at 59 n.8. The policy defined "occurrence" as:

> [A]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises shall be deemed one occurrence.

*Id.* One of the crucial issues in the case was whether all of the sex discrimination claims arose out of a single occurrence – the discriminatory employment practices – or multiple occurrences – the harm suffered by each plaintiff in the underlying discrimination lawsuit. We wrote:

> The general rule is that an occurrence is

9

determined by the cause or causes of the resulting injury. The majority of jurisdictions employ the cause theory. Using this analysis, the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.

Applying the general rule to the facts of this case we agree with the district court's finding that there was but one occurrence for purposes of policy coverage. The injuries for which Liberty was liable all resulted from a common source: Liberty's discriminatory employment policies. Therefore, the single occurrence, for purposes of policy coverage, should be defined as Liberty's adoption of its discriminatory employment policies in 1965.

The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence. Indeed, the definition of the term "occurrence" in the Appalachian policy contemplates that one occurrence may have multiple and disparate impacts on individuals and that injuries may extend over a period of time.

*Id*. at 61 (citations, internal quotations and bracket omitted).

10

Here, applying *Appalachian*, the district court found that the asbestos claimants' "injuries stem from a common source, that is, the manufacture and sale of the asbestos-containing products." App. 31. Accordingly, the district court held that "the policy language is clear and unambiguous that the injuries arising from this common source must be treated as resulting from a single occurrence." *Id*.

Treesdale advances a number of arguments in support of its contrary contention.[7] Treesdale first argues that *Appalachian* is not applicable because it was decided under Massachusetts law, not Pennsylvania law.[8] We disagree.

---

[7]Treesdale suggests that *Appalachian* should not have been applied by the district court because the policy in *Appalachian* did not define "occurrence" and, therefore, we applied the common law definition. However, says Treesdale, here the policy in question defines that term and it was therefore improper to rely upon the common law meaning of the term. However, as is evident from the *Appalachian* opinion, the policy there also defined "occurrence." 676 F.2d at 59 n.8.

[8]Treesdale and Liberty Mutual agree that Pennsylvania law governs the interpretation of the UEL policies. Under Pennsylvania law, the task of interpreting a contract, including an insurance contract, is a matter of law for the court. *Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986). *Id.* "The polestar of [the court's] inquiry . . . is the language of the insurance policy." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106

11

Admittedly, the district court in *Appalachian* did find that under Pennsylvania's choice of law rules, Massachusetts law governed the policy's interpretation. 676 F.2d at 60 n.10. However, we explained that we did not need to address that ruling "because the principles we apply in this case are not limited to Massachusetts." *Id.* (citation omitted). We also noted that the "majority of jurisdictions employ the cause theory." *Id.* at 61 (internal quotations omitted). More importantly, however, the Pennsylvania Superior Court has adopted the *Appalachian* cause of loss test to define occurrence. *D'Auria v. Zurich Ins. Co.*, 507 A.2d 857, 860 (Pa. Super. 1986); *see also General Accident Ins. Co. of America v. Allen*, 708 A.2d 828, 834-35 (Pa. Super. 1998).[9] Moreover, in *Scirex Corp. v. Federal Ins. Co.*, 313 F.3d 814 (3d Cir. 2002), a case decided under Pennsylvania law, we also applied *Appalachian*'s cause of loss test in determining the number of occurrences. *See id.* at 852 ("[T]he accepted purpose of defining 'an occurrence or event'

_____

(Pa. 1999). "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured. . . . Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Gene & Harvey Builders*, 517 A.2d at 913.

[9]"In the absence of a controlling decision of the state's highest court, the decisions of intermediate state courts having statewide jurisdiction are normally a strong indication of what the state law is." *Hamme v. Dreis & Krump Manufacturing Co.*, 716 F.2d 152, 155 (3d Cir. 1983) (citations omitted).

is to limit liability, and in the insurance industry 'occurrence' is commonly understood to mean all loss caused by a single act or related events.") (citing, *inter alia*, *Appalachian*). Accordingly, the district court properly allowed the *Appalachian* cause of loss test to control its inquiry into whether there were multiple occurrences here.

Treesdale next argues the district court's reliance on a common source (the manufacture and sale of the asbestos-containing product) is illogical because the court failed to explain how the manufacture and sale of an asbestos-containing product could ever be an "occurrence" as the term is defined in the policy. As noted above, the policy defines an "occurrence" as "injurious exposure to conditions" which result in personal injury or "continuous or repeated exposure to substantially the same general conditions." Treesdale contends that manufacture and sale of the asbestos-containing product is neither an "exposure" to anything nor a "condition" to which a claimant could be exposed.[10]

Again, we disagree. Treesdale focuses on phrases that it believes are favorable to its interpretation of the policy and ignores all of the other language that runs counter to its interpretation. It is clear that the "Limits of Liability" section refers to limits on a per occurrence basis, and not a per claim or

_____

[10]Treesdale concedes that manufacture and sale of an asbestos-containing product could be exposure if the claimants were working in the factory that made the product. However, none of the asbestos claimants in this case were. Treesdale's Br. at 15 n.4.

per person basis. The Limits of Liability provision begins by saying that: "[r]egardless of the number of insureds . . . who sustain personal injury . . . the company's liability is limited as follows." Immediately following that statement is the description of the limit of liability for "Each Occurrence." That limit is "the limit of the company's liability for all personal injury. . . sustained by one or more persons." Thus, a single occurrence can clearly result in injuries to multiple persons, and it could hardly be otherwise given the structure of the policy. It bears restating that subsequent language in the "Limits of Liability" section states: "[f]or the purpose of determining the limits of the company's liability. . . all personal injury. . . arising out of continuous or repeated exposure to substantially the same general conditions. . . shall be considered as the result of one and the same occurrence."

That section unambiguously addresses the situation where, as here, many people allege personal injuries in different years arising from one occurrence. Thus, we think that any fair reading of the Limits of Liability provision establishes that all injuries arising from the same source arise from one occurrence.

Treesdale's third argument is that the cause of loss test does not apply when asbestos claims are asserted against an insured and there is a dispute about whether the claims constitute multiple occurrences. Treesdale cites a footnote in *Appalachian* where we said that we would "not even speculate as to how the principles applied in this case would apply, if at all" to asbestos litigation. 676 F.2d at 62 n.14. However, Treesdale reads too much into that footnote, and also takes it out of context.

14

We had to resolve two issues in *Appalachian*. We first had to determine the number of occurrences, and then decide when the injurious effects of the occurrence took place. The footnote pertains to the second issue. We explained that "[w]hile the 'cause' test is appropriate for determining whether there is a single occurrence or multiple occurrences, it is not applicable in determining when an occurrence takes place." 676 F.2d at 61. Rather, we stated that inquiry is governed by an "effect" test. We held that "the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place." *Id*. at 61-62. Applying the "effect" test, we said "in this type of case, the occurrence takes place when the injuries first manifest themselves." *Id*. at 62. We held that "the injuries to Liberty's employees occurred immediately upon the promulgation of Liberty's discriminatory employment policies." *Id.*

We were therefore referring to the "effect" test and not the "cause of loss" test in footnote 14. Moreover, Treesdale has taken the "we will not speculate phrase" out of context. The entire footnote reads:

> This is not a case where an insured commits a tortious act and then after a lapse of time a claimant is injured by that act. Here, Liberty's policy of sex discrimination had an immediate impact on its female employees in the claims department. Nor is this case akin to the litigation involving coverage of defendants involved in asbestos litigation. In those cases it is not at all clear when the alleged tortious acts of the

15

> defendants first impacted on the health of a
> victim of asbestosis. We do not even speculate as
> to how the principles applied in this case would
> apply, if at all, to cases of those types.

676 F.2d at 62 n.14.

We would not speculate about how the "effect" test would apply to asbestos litigation because asbestos in the lungs constitutes three distinct kinds of injury: (1) initial exposure to asbestos; (2) exposure-in-residence;[11] and (3) manifestation of asbestos-related disease. *See, e.g., Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 707 F.Supp. 762, 768 (E.D. Pa. 1989), *aff'd in part and vacated in part on other grounds*, 25 F.3d 177 (3d Cir. 1994) ("*Air Products* I"). We could not speculate about the application of the "effect" test in that context, and the issue was not before us. Thus, the dicta in the footnote does not support Treesdale's claim that the *Appalachian* cause of loss test does not apply here.

Undeterred, Treesdale argues that the *Appalachian* test does not apply to asbestos litigation because the Pennsylvania Supreme Court has recognized that asbestos in the lungs

---

[11]"'Exposure-in-residence' constitutes the period between exposure to asbestos and manifestation of asbestos-related disease." *Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 707 F.Supp. 762, 769 (E.D. Pa. 1989) (citation omitted), *aff'd in part and vacated in part on other grounds*, 25 F.3d 177 (3d Cir. 1994).

constitutes three distinct injuries and has, therefore, adopted the "triple-trigger" theory of insurance coverage, *J.H. France Refractories v. Allstate Ins. Co.*, 626 A.2d 502 (Pa. 1993). However, that mixes apples and oranges. In *J.H. France*, the Pennsylvania Supreme Court held that "all stages of the disease process are bodily injury sufficient to trigger [an] obligation to indemnify, as all phases independently meet the . . . definition of bodily injury." *Id.* at 507. Thus, *J.H. France* addressed only the question of when a sufficient injury occurs to trigger the insurer's indemnification obligation. It had nothing to do with the distinct "occurrence" question, and it does not support Treesdale's position here.

Finally, Treesdale attempts to draw support from three cases from other jurisdictions to advance its contention that each claimant's exposure to asbestos was a separate occurrence. We are not persuaded.

In *Metropolitan Life Ins. Co. v. Aetna Casualty and Surety Co.*, 765 A.2d 891 (Conn. 2001), a health insurer brought a declaratory judgment action against its excess liability insurer seeking a ruling that its alleged failure to warn of the dangers of asbestos was a single occurrence satisfying the threshold for coverage.[12] The excess liability policies contained

---

[12]The health insurer had engaged in studies concerning asbestos. It had been sued by approximately 200,000 plaintiffs, mainly industrial, shipyard and construction workers who were not policyholders. Rather, they asserted that the health insurer assumed a duty to warn the general public about the dangers of asbestos when it undertook its research on asbestos.

17

the following "continuous exposure clause:"

> The total liability of the company for all damages, including damages for care and loss of services, as the result of any one occurrence shall not exceed the limit of liability stated in the declarations as applicable to "each occurrence." For purposes of determining the limit of the company's liability and the retained limit, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

765 A.2d at 300-01. However, the policies did not define "occurrence." *Id.* at 301.

The health insurer argued that all of the asbestos claims at issue had a single cause (a failure to warn of the dangers of asbestos), and therefore there was but one occurrence. *Id.* at 303 ("Metropolitan contends that we must examine the *cause* of its liability in the underlying claims. On that basis, it argues that there is a single occurrence") (emphasis in original). The excess liability carrier argued that each claimant's exposure to asbestos was a separate occurrence. *Id.* at 301. For reasons not relevant to our discussion, the Connecticut Supreme Court found that there were multiple occurrences, i.e., that each individual claimant's exposure to asbestos was a separate occurrence. However, *Metropolitan* doesn't help Treesdale because the court did not apply the cause of loss test required by our precedent and Pennsylvania law.

18

In *In re: Prudential Lines, Inc.*, 158 F.3d 65 (2d Cir. 1998), approximately 5,000 claimants alleged that they had suffered asbestos-related injuries after being exposed to asbestos while working aboard Prudential's ships. Prudential was insured by American Club. The deductible provision in each policy provided that personal injury claims "are subject to a deduction" in a stated amount "with respect to each accident or occurrence." *Id.* at 76. However, neither "accident" nor "occurrence" was defined in the disputed policies. Under the circumstances there, the court of appeals agreed that each claimant's exposure was a separate occurrence. However, *In re: Prudential Lines* is in tension with *Appalachian*. The same is true of *Babcock & Wilcox Co. v. Arkwright-Boston Manufacturing Mut. Ins. Co.*, 53 F.3d 762 (6th Cir. 1995). There, the court also concluded that each boilerworker's exposure to asbestos was a separate occurrence and rejected the manufacturer's claim that its decision to use asbestos in its boilers was the occurrence. The policies in question defined "occurrence" as follows:

> The term "occurrence," whenever used herein, shall mean any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to all the Assured's operations.

*Id.* at 765. However, we can not accept the analysis in *Babcock & Wilcox Co.,* given our holding in *Appalachian*, and the

19

dictates of Pennsylvania law.[13]

Accordingly, for all of the above reasons, we hold that the district court's conclusion that all of the asbestos claims here arose from a single occurrence was correct.

## B. The Non-Cumulation Provision in the UEL Policies.

As noted, after the district court found that there was but one occurrence, it then found that the Non-Cumulation provision in the UEL policies precluded stacking policy limits and therefore limited Liberty Mutual's coverage liability to $5

---

[13] We also note that at least two district courts in this circuit have applied the *Appalachian* cause of loss test in asbestos litigation. *See Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 707 F.Supp. 762, 768 (E.D. Pa. 1989), *aff'd in part and vacated in part on other grounds*, 25 F.3d 177 (3d Cir. 1994) ("*Air Products* I"), and *Colt Industries Inc. v. Aetna Cas. & Sur. Co.*, 1989 WL 147615 (E.D. Pa. Dec. 6, 1989)

We recognize that Treesdale cites a district court case from this circuit in which the court held that the "'cause' of the [asbestos] injuries . . . is the exposure of each individual to asbestos." *Pittsburgh Corning Corp. v. Travelers Indemnity Co.*, 1988 WL 5302 at *2 (E.D. Pa. 1988). There, the court was interpreting the "Policy Period: – Territory" clause in a first layer excess policy that Commercial Union Insurance Company had issued to Pittsburgh Corning.

million – the highest limit of liability under any of the UEL policies.

> The Non-Cumulation provision provides:
> Non-Cumulation of Liability – Same **Occurrence** – If the same **occurrence** gives rise to **personal injury, property damage** or **advertising injury or damage** which occurs partly before and partly within any **annual period** of this policy, then each **occurrence** limit and the applicable aggregate limit or limits of the policy shall be reduced by the amount of each payment made by the company with respect to each **occurrence**, either under a previous policy or policies of which this policy is a replacement, or under this policy with respect to previous **annual periods** thereof.

Liberty Mutual submits that the Non-Cumulation provision is intended to prevent stacking or cumulation of policy limits of its consecutive UEL policies that apply to the same occurrence. The UEL policies treat all injury arising out of a continuous or repeated exposure to substantially the same general conditions "as the result of one and the same occurrence." The Non-Cumulation provision then states that if such a single occurrence gives rise to injury during more than one policy period, only one occurrence limit will apply. Put another way, the Non-Cumulation provision ensures that if an occurrence has been covered by one policy in a line of successive policies issued by Liberty Mutual, then only one occurrence limit will

21

apply. Thus, claims paid by Liberty Mutual for one occurrence under the 1975-1976 UEL policy would correspondingly reduce the occurrence limit of the successive policies. The highest liability Liberty Mutual had under any one UEL policy was $5,000,000. Liberty Mutual claims that it has already paid $5,000,000 in asbestos settlements and or judgments on behalf of Treesdale under the UEL policies. Therefore, it contends that it has no further duty to Treesdale.

Treesdale, while contending that there are multiple occurrences argues in the alternative that even if there is a single occurrence, the Non-Cumulative provision does not apply[14] because it may access the UEL policies in reverse chronological order. That, argues Treesdale, precludes there ever being a "payment made . . . under a previous policy." Under this theory of accessing the policies, Treesdale contends

---

[14]Treesdale does not argue that the Non-Cumulation provision is void under Pennsylvania law. It does say, however, that the New Jersey Supreme Court has found that the Non-Cumulation provision is unenforceable. *Spaulding Composites Co. v. Aetna Cas. & Sur. Co.*, 819 A.2d 410, 422 (N.J. 2003). Liberty Mutual concedes that no Pennsylvania state court has addressed the Non-Cumulation provision. However, Liberty Mutual notes that under Pennsylvania law anti-stacking provisions in automobile insurance policies are enforceable as long as the language prohibiting stacking is clear and unambiguous. *Bishop v. Washington*, 480 A.2d 1088 (Pa.Super. 1984); *Equibank v. State Farm Mut. Auto. Ins. Co.*, 626 A.2d 1243 (Pa.Super. 1993).

that Liberty Mutual's coverage obligation is not limited to $5,000,000 – the highest liability Liberty Mutual had under any one UEL policy – but is $26,000,000 – Liberty Mutual's total liability under all ten of the UEL policies.

Although Treesdale's alternative position is very creative, it is not very meritorious. To explain it, we must set forth Treesdale's interpretation of the  Pennsylvania law of insurance coverage "triggers."[15]  Treesdale contends that every Liberty Mutual UEL policy has been triggered[16] and to support that contention it  quotes liberally from *J.H. France Refractories Co. v. Allstate Insurance Co.*, 626 A.2d 502 (Pa. 1993), which it refers to as *France III*.  It writes:

> All stages of the disease process [relating to asbestos injury, including exposure, progression, and manifestation] are bodily injury sufficient to trigger [a]n obligation to indemnify, as all phases independently meet the . . . definition  of bodily injury.  Thus, every insurance policy on the risk at any time during the development of a claimant's asbestos-related  disease has an obligation to indemnify" the insured and [a]ny

---

[15]Treesdale's discussion seems to be unique to asbestos injuries.

[16]Liberty Mutual's brief is silent with regard to the question of whether all ten of its UEL policies have been triggered.

policy in effect during the period from exposure to manifestation must indemnify the insured until its coverage is exhausted. This method of invoking coverage is otherwise known as the "continuous" or "multiple" trigger.

Here, the underlying Asbestos Claimants allege injuries – exposure, exposure in residence, or manifestations – which trigger all of the Liberty Mutual policies. Liberty Mutual does not contest this point as it has already provided coverage under the ten CGL Policies underlying the UEL Policies.

Treesdale's Br. at 42-43 (some internal quotation marks and citations omitted). In addition to claiming that all ten UEL policies have been triggered, Treesdale contends that it is free to select the order in which the UEL policies are accessed. It argues:

In order to accord [the insured] the coverage promised by the insurance policies, [the insured] should be free to select the policy or policies under which it is to be indemnified. When the policy limits of a given [policy] are exhausted, [the insured] is entitled to seek indemnification from *any* of the remaining [policies] which was on the risk during the development of the disease. Any policy in effect during the period from exposure to manifestation must indemnify the insured until its coverage is exhausted. Under

24

[*France III*], if more than one policy is triggered, the *insured* 'should be free to select the policy or policies under which it is indemnified.' When the policy limits of the chosen policy are exhausted, then the insured is entitled to choose again from the triggered policies and continue to do so until fully indemnified for the claims. (emphasis in original, internal citations omitted).

Treesdale's Br. at 43-44. Treesdale thus submits that it can choose which of the ten triggered UEL policies should provide coverage first. Under Treesdale's approach, if the first UEL policy is exhausted, Treesdale may then choose another, and so on, until all of the UEL policies are exhausted.

Treesdale then argues that if it selects the last issued UEL policy – the 1984-1985 policy – the Non-Cumulation provision becomes inoperative. Thus, instead of the $5,000,000 obligation that Liberty Mutual says it owes under the UEL policies, Liberty Mutual's obligation would be $26,000,000 – the total obligation under all ten of the UEL policies.

The district court rejected Treesdale's "reverse chronological order" theory based, in part, on *O-I Brockway Glass Container, Inc. v. Liberty Mutual Ins. Co.*, 1994 WL 910935 (D.N.J. Feb. 10, 1994). That case involved a Non-Cumulation provision almost identical to the one here, and O-I Brockway argued a "reverse chronological order" theory to avoid the Non-Cumulation provision. The district court found that the provision, "in both content and title," prevents an insured from stacking the policy limits. *Id*. at *3. It concluded

25

the provision provides that an "insured shall not recover more than the per occurrence limit by invoking coverage under several policies for the same occurrence." *Id.* The district court there also rejected the "reverse chronological order" theory explaining:

> Brockway's interpretation of the Non-Cumulation clause is incorrect because it relies on an obtuse reverse-chronology rather than the clear intention of the clause. If one asked a reasonable person whether the Non-Cumulation clause would allow an insured to recover the $250,000 limit under all of the 1975, 1976, 1977, 1978, 1979, 1980, 1981, 1982 and 1983 policies *for the same occurrence*, the answer would most certainly be "no." It is only when Brockway strains the construction of the clause to hinge on some abstract sequence in which Brockway taps the policies that ambiguity is allegedly created. An insured would have the reasonable expectation that the Non-Cumulation clause prohibits the recovery of more than the per occurrence limit for each occurrence, not that the Non-Cumulation clause's applicability depends on the sequence chosen to tap each policy.

*Id*. (emphasis added).

Treesdale contends that *O-I Brockway* has been discredited because the New Jersey Supreme Court has since found that Liberty Mutual's Non-Cumulation provision is unenforceable. *See* n.14, *supra.* However, even if Treesdale is

correct and the Non-Cumulation provision is unenforceable in New Jersey, anti-stacking clauses, at least in automobile policies, are enforceable under Pennsylvania law as long as they are clear and unambiguous. *Id*. The clause here is clear and unambiguous absent Treesdale's imaginative, but strained and result-oriented interpretation of the plain language of Liberty Mutual's policies.

As the court correctly noted in *O-I Brockway*, it is simply not reasonable to think that the Non-Cumulation provision would allow recovery under all of the UEL policies for the same occurrence simply by allowing an insured to engage in an alchemistic manipulation of the relevant chronology. Such an interpretation violates the provision's very purpose and allows it to be read entirely out of the policy by an illogical and tortured reading of the policy's provisions. We are hard-pressed to think that an insurance company would issue a policy with an anti-stacking provision, but intentionally include a provision that would void that anti-stacking provision by allowing the insured to invoke coverage in reverse chronological order. It is clear from the way the provision is written, that it applies without regard to the order in which the policies are chosen. It provides that the each occurrence limit "shall be reduced by the amount of each payment made by the company with respect to each occurrence, *either under a previous policy or policies* of which this policy is a replacement, or *under this policy* with respect to previous

annual periods thereof." (emphasis added).[17]

Treesdale also attempts to rest its argument partly upon *Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co*., 1989 WL 73656 (E.D. Pa. June 30, 1989) ("*Air Products* II"), and that opinion does have language that supports Treesdale's theory. One of the issues before the court there was the effect of the Non-Cumulation provision in Liberty Mutual's insurance policies with Air Products. The provision was identical to the provision in this appeal. In a footnote, the district court wrote:

> The limit of Liberty's maximum per-occurrence liability depends upon the sequence of the claims against both policies. For example, if *all* asbestos claims initially trigger the 1972-1975 policy, and the payments are made under that policy up to the $500,000 occurrence limit, the $1,000,000 per occurrence limit of the 1975-1978 policy would be reduced to $500,000, leaving plaintiff with total coverage of $1,000,000. In the unlikely event that the first million dollars of asbestos claims are paid under the 1975-1978 policy, then the plaintiff would have $1,500,000 in coverage. In that case, the initial payout on the 1975-1978 policy would not reduce the $500,000 per occurrence limit of the 1972-1975 policy.

---

[17]The "under this policy" sentence was not in the Non-Cumulation provision in *O-I Brockway*.

28

1989 WL 73656 at *3 n.4 (emphasis in original).

Treesdale contends that this footnote supports its "reverse chronological order" theory, and we agree that it does. However, the case is not controlling and the footnote is dicta. It had nothing to do with the disposition of the case. Moreover, for the reasons we have already discussed, we believe the footnote is wrong.

Alternatively, Treesdale argues that the Non-Cumulation provision does not apply because each of the UEL policies has only one annual period and none is a replacement for any other UEL policy. Treesdale notes that the Non-Cumulation provision states that payments made with respect to a given occurrence will reduce "each occurrence limit and the applicable aggregate limit or limits of [a given UEL policy]" only if those payments were made "either under a previous policy or policies of which [the given UEL policy] is a replacement, or under [the given UEL] policy with respect to previous annual periods thereof." Therefore, contends Treesdale, for a payment to reduce the amount available under a given UEL policy, that payment must be made (1) under a previous annual period of that policy or (2) under a "previous policy or policies of which [the] policy is a replacement."

However, Treesdale submits that there are "no annual periods" for any of the UEL policies because each of the ten UEL policies has a different policy number, and the premiums and coverages varied. Therefore, concludes Treesdale, rather than one continuous policy covering the period from May 1, 1975 until February 1, 1985, Liberty Mutual issued ten

independent policies and each of those policies was in effect for a one year period from May 1st of a given year until May 1st of the succeeding year. Accordingly, Treesdale submits that because each policy is independent and distinct, there can be no "previous annual period" for any given UEL policy. Treesdale further submits that there can be no "previous annual period" for any of the ten UEL policies because none of them was a multi-year policy, e.g., a three-year policy. Consequently, the Non-Cumulation provision is inapplicable because any payment made under any UEL policy that came before a given UEL policy is not a payment under the policy with respect to previous annual period.

Treesdale also claims that none of the UEL policies is a replacement of a previous policy or policies. Treesdale contends that the term "replacement" is a term of art in the insurance industry and is distinct from "renewal." Treesdale's Br. at 53 (citation omitted). Treesdale submits that the generally accepted meaning of replacement in the insurance industry is "conduct effecting cancellation of a policy in one company and the sale and issuance of a correlative policy, usually, but not necessarily, in another company." *Id.* (citation omitted). Based on these "authorities," Treesdale argues that none of the UEL policies was a replacement of any prior UEL policy because each UEL policy was a separate and independent policy covering the same risks during different periods

Liberty Mutual responds by conceding that the UEL policies were renewal policies, but that, in common sense parlance, "renewal" and "replacement" mean essentially the same thing. For example, Liberty Mutual cites to Webster's

30

dictionary where "renew" is defined as meaning: "to replace as by a fresh supply of [to *renew* provisions]."   It also cites to Black's Law Dictionary which defines "renew" as including "to replace."

Liberty Mutual also cites *Little v. Progressive Ins. Co.*, 783 N.E.2d 307, 314 (Ind.App. 2003) in claiming that courts have given "replacement" and "renewal" meanings that are consistent with the common understanding of those words. There, the court stated "a renewal policy is issued to replace the preceding policy governing relations between insurer and insured" and a "renewal policy . . . is a replacement policy issued at the end of a policy period."

Finally, Liberty Mutual says that its interpretation of replacement as encompassing renewal is supported by insurance statutory law in at least sixteen states which have defined "renewal" as "the issuance and delivery by an insurer of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer."  Liberty Mutual's Br. at 52 (citations omitted).

Although Treesdale's argument as to this issue is not without force, we are persuaded by Liberty Mutual's rejoinder.

Treesdale next argues that the Non-Cumulation provision is unenforceable because it is an escape clause. "[A]n 'escape' clause . . . is generally defined as a clause providing that there shall be no coverage where there is other valid and collectible insurance." *Auto. Underwriters, Inc. v. Fireman's Fund Ins. Co.*, 874 F.2d 188, 191 (3d Cir. 1989).  Treesdale argues that

31

the provision operates as an escape clause because Liberty Mutual issued ten consecutive UEL policies but seeks to avoid its obligations under nine of those policies by relying upon the non-cumulation clause in any one of them.

However, the Non-Cumulation provision, like all anti-stacking provisions, does not eliminate coverage. It simply provides that if a single occurrence gives rise to an injury during more that one policy period, only one occurrence limit will apply. The provision limits the dollar amount recoverable under the policies, but it does not eliminate coverage. In *Air Products and Chemicals, Inc. v. Hartford Accident and Indemnity Co.*, 1989 WL 73656 (E.D. Pa. June 30, 1989), the district court rejected the exact same argument Treesdale makes here. The district court there stated:

> the non-cumulation . . . provisions do not constitute escape clauses, as the provisions seek only to limit, rather than preclude, Liberty's liability for claims against its insured. Thus, there is no basis . . . for failing to enforce the terms of those provisions.

1989 WL 73656 at *2. Not surprisingly, Treesdale has offered no authority to support its claim that an anti-stacking provision is an unenforceable escape clause.

Treesdale's final argument restates this contention by suggesting that the Non-Cumulation provision is unenforceable because it frustrates Treesdale's reasonable expectations. Treesdale says that it purchased ten separate UEL policies from

32

Liberty Mutual and paid ten separate premiums for those ten separate policies. Nonetheless, claims Treesdale, Liberty Mutual now seeks to disclaim coverage under the first nine of those policies because it provided coverage under the tenth. Treesdale argues that in purchasing and paying for ten policies, it reasonably expected that it would receive coverage under all ten policies. In other words, Treesdale argues that it had a reasonable expectation it could stack coverage under the UEL policies.

"Pennsylvania case law . . dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted). "In most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Id.* (citation and internal quotations omitted). "Courts, however, must examine the totality of the insurance transaction involved to ascertain the reasonable expectations of the insured." *Id.* (citations and internal quotations omitted). "As a result, even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage." *Id.* (citations omitted). However, this aspect of the doctrine is only applied "in very limited circumstances" to protect non-commercial insureds from policy terms not readily apparent and from insurer deception. *Madison Construction Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 109 (Pa. 1999) n.8. Absent sufficient justification, however, "an insured may not complain that his or her reasonable expectations were frustrated by policy limitations that are clear and unambiguous." *Frain v. Keystone*

33

*Ins. Co.*, 640 A.2d 1352, 1354 (Pa. Super. 1994).

Here, Treesdale is not contending that the Non-Cumulation provision is ambiguous. Indeed, Liberty Mutual contends that Treesdale conceded that the language was clear and unambiguous in the district court. Thus, the reasonable expectations canon of insurance law does not assist Treesdale's attempt to argue an expectation that is contrary to the coverage clearly set forth in the insurance policy.[18] Accordingly, it cannot invoke the reasonable expectations doctrine.

## IV. CONCLUSION

For all of the above reasons, we will affirm the district court.

_____

[18] For purposes of our discussion, we ignore the fact that Treesdale is hardly a "non-commercial" insured and that the doctrine of reasonable expectations has extremely limited relevance to our discussion if it applies at all.

34