**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-2687
_____

PENN NATIONAL INSURANCE COMPANY,

Appellant

v.

NORTH RIVER INSURANCE COMPANY;
ABC INSURANCE COMPANIES (1-5) (fictitious names)

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-09-CV-04644)
District Judge: Hon. Katharine S. Hayden

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 24, 2019

Before: MCKEE, SHWARTZ, and FUENTES, *Circuit Judges*.

(Opinion Filed: July 30, 2019)
_____

OPINION**

_____

---

** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FUENTES, *Circuit Judge*.

This appeal asks us to consider the liability of an excess insurance carrier, North River Insurance Company, for payments made on behalf of an insured in three environmental waste lawsuits, involving three sites: the Helen Kramer landfill, the Buzby landfill, and the BEMS landfill. The District Court concluded that the statute of limitations had run with respect to the lawsuit over the Helen Kramer landfill, granting summary judgment to North River. The District Court also concluded that North River was not responsible for contribution on the Buzby and BEMS lawsuits, because the primary insurer, Penn National, had not exhausted its policy limits. On the first issue, we agree with the District Court's grant of summary judgment to North River regarding the Helen Kramer landfill lawsuit. On the second, we remand so that the District Court may more fully consider: (1) the applicability of *Carter-Wallace, Inc. v. Admiral Insurance Co.*;[1] and (2) whether there was an aggregate policy limit in effect that required North River to contribute to the Buzby and BEMS landfill settlements.[2]

## I.

Gus Bittner, Inc., a non-party, is a now-defunct waste hauling business that operated from the late 1950s through early 1996. For a ten-year period beginning January 1976, Bittner was insured by Penn National under a series of insurance policies and had

---

[1] 712 A.2d 1116 (N.J. 1998).
[2] As we discuss later, consideration of the applicability of *Carter-Wallace* does not disturb any settlement the parties may have entered into with respect to the Helen Kramer landfill, but the District Court may consider any settlement as part of the *Carter-Wallace* analysis.

umbrella/excess insurance policies from North River.[3]  Below is a summary of the relevant insurance policy limits during that time period.

| Date | Penn National | North River |
|---|---|---|
| January 1976– January 1979 | $100,000 (per occurrence) | $2,000,000 (aggregate) |
| January 1979– January 1982 | $100,000 (per occurrence) | $3,000,000 (aggregate) |
| January 1982– January 1985 | $500,000 (per occurrence) | $10,000,000 (aggregate) |

The heart of Penn National and North River's dispute is their respective obligations to provide coverage for Bittner in light of three environmental lawsuits it faced.  The lawsuits involved Bittner's hauling activities at three landfills:  the Buzby landfill, located in Voorhees, New Jersey; the BEMS landfill, located in Burlington County, New Jersey; and the Helen Kramer landfill, located in Mantua, New Jersey.  Penn National spent $2.55 million in indemnity payments on behalf of Bittner in connection with the Helen Kramer landfill lawsuit, $99,590 in connection with the Buzby landfill lawsuit, and $48,013 in connection with the BEMS landfill lawsuit.  Penn National has also paid certain defense costs for Bittner.  North River has contributed $349,680, which went toward the Helen Kramer landfill settlement. In 2007, Penn National informed North River that its policy limits had been exhausted for the 1982–86 policy years, and when North River declined to assume Bittner's defense and indemnification costs, this lawsuit followed.  Penn National brought three claims against North River:  a claim for declaratory judgment, a breach of contract claim, and an unjust enrichment claim.

---

[3] Penn National's coverage of Bittner extended a year beyond that, to January 1986.  That coverage year is not related to this lawsuit.

Penn National argued that under the insurance allocation scheme set forth in *Carter-Wallace, Inc. v. Admiral Insurance Co.*, North River should be required to contribute more for Bittner's indemnification and defense costs. North River put forward three relevant arguments: (1) because the Helen Kramer landfill case was settled in 1998, Penn National's claims were time barred; (2) North River's contribution of approximately $350,000 toward the Helen Kramer landfill settlement constituted a conclusive and binding settlement between the parties; and (3) because Penn National's policy form for the 1982–1983 policy year did not include an aggregate policy limit, it did not owe any money toward the Buzby and BEMS landfill investigations.

In 2012, both parties moved for summary judgment. The District Court denied both motions, concluding that there were two issues of fact precluding summary judgment: first, whether North River's Helen Kramer landfill payment constituted a settlement between the parties; and second, whether Penn National's 1982–1983 policy contained an aggregate limit.

The parties moved for summary judgment again in 2016. This time, the District Court granted North River's motion, concluding that Penn National's claims were time-barred. Specifically, the District Court determined that each of the landfill claims constituted separate occurrences under New Jersey law. The court then concluded that because the Helen Kramer landfill lawsuit settled in 1998, Penn National's claims were time barred with respect to that lawsuit. Because the other claims did not reach Penn National's per occurrence policy limits, the court found that Penn National also could not establish its claims with respect to the BEMS and Buzby landfills. This appeal followed.

4

## II.[4]

Penn National's primary argument is that the District Court erred by holding that the statute of limitations had expired on Penn National's claims with respect to the Helen Kramer landfill. It argues that because Bittner's hauling activities were implicated in each of the three cases, they constitute a single occurrence under New Jersey law, and as such, the statute of limitations did not begin to run until the resolution of the BEMS litigation in 2011.

The District Court resolved this question by looking to guidance from the New Jersey Appellate Division.[5] In *Doria v. Insurance Co. of North America*, the appellate division explained that "for the purpose of counting the number of occurrences, the term must be construed from the point of view of the cause or causes of the accident rather than its effect."[6] Thus, the damages that resulted from a young boy falling into an abandoned pool and the damages that resulted from his brother, who fell in trying to help him, constituted a single occurrence under the pool owners' insurance agreement.[7] The court emphasized that both boys were injured due to a single cause—the failure of the pool owners to fence and cover their pool—and their injuries were closely connected in space

---

[4] The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a) because Penn National is incorporated in Pennsylvania and has its principal place of business there, while North River is incorporated in New Jersey and has its principal place of business there. We have jurisdiction to review the District Court's order granting North River summary judgment under 28 U.S.C. § 1291.

[5] The decisions of state intermediate appellate courts "are not automatically controlling;" however, they can provide us assistance in "predicting how the state's highest court would rule." *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 (3d Cir. 2007) (citation omitted).

[6] 509 A.2d 220, 223 (N.J. Super. Ct. App. Div. 1986).

[7] *Id.* at 224–25.

and time.[8]  Under *Doria*, the District Court determined that Penn National's arguments were insufficient because "Bittner hauled to separate landfills, in separate geographical locations, at separate times over the course of nearly a decade, causing alleged environmental damage at distinct and discrete locations."[9]

We agree.  First, Penn National argues that the District Court erred because it should have recognized that all of the damages in this case arise from the "common cause" of "Bittner's hauling of hazardous waste."[10]  Penn National points us to *Liberty Mutual Insurance Co. v. Treesdale, Inc.*, in which we determined that claims relating to Treesdale's manufacturing of an asbestos-containing product, Soffelex, constituted a single occurrence under Liberty Mutual's insurance policy.[11]  However, *Treesdale* was a products liability case in which the damages all arose from a single product containing asbestos.[12]  Here, in contrast, Bittner hauled various forms of waste to three discrete landfills at different times. There is no evidence of a temporal or spatial connection and no evidence of a common cause beyond Penn National's vague assertion that the damages all arose from Bittner's

---

[8] *Id.*

[9] *Penn Nat'l Ins. Co. v. Crum & Foster Ins. Co.*, Civ. A. No. 09-CV-4644, 2012 WL 12914667, at *3 (D.N.J. Nov. 20, 2012).  The District Court also found support for its conclusion in the testimony of Penn National's corporate designee, who explained that the company viewed Bittner's hauling activities at different landfills as separate occurrences. Additionally, the Court noted that Penn National's argument that its claims were not ripe until the settlement of the BEMS litigation in 2011 was belied by the fact that it initiated this lawsuit in 2009, before the litigation was settled.

[10] Appellant's Br. at 28.

[11] 418 F.3d 330, 339 (3d Cir. 2005).  *Treesdale* applies Pennsylvania law, under which courts to use a cause of loss test to define an occurrence under an insurance policy. *Id.* at 335–36. The Pennsylvania test therefore has a slightly different focus than the one outlined by the New Jersey Appellate Division.

[12] *Id.* at 333.

"hauling" activity.[13] In this case, Bittner was a waste hauling company; nearly all of its activities could be considered connected to hauling in some way. That is insufficient to show that the environmental damage at each of the three landfill sites arose from a common cause.

Second, Penn National argues that the District Court should not have entertained North River's statute of limitations argument based on the law of the case doctrine. Under that doctrine, when a court "decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[14] But while Penn National suggests that the District Court "rejected" North River's statute of limitations argument in 2012,[15] the record does not support that suggestion. In fact, the 2012 denial of summary judgment makes no mention of the statute of limitations. Because the law of the case doctrine only applies where there was an "actual decision" of the issue, we conclude that the doctrine does not apply here.[16]

Third, Penn National argues that even if the District Court properly rejected its breach of contract claim based on the statute of limitations, the District Court should not

---

[13] Appellant's Br. at 28.
[14] *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).
[15] Appellant's Br. at 31.
[16] *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010). The doctrine can apply to issues "decided by necessary implication." *Bolden v. SEPTA*, 21 F.3d 29, 31 (3d Cir. 1994). While the factual dispute over the Helen Kramer landfill settlement would not have mattered had the District Court decided that the statute of limitations barred that claim, the District Court also denied summary judgment because of the dispute over the Penn National's aggregate policy limit. A decision on North River's statute of limitations argument was therefore not necessary to its holding.

7

have dismissed its equitable claim for unjust enrichment. Penn National argues that this claim is governed by the doctrine of laches rather than the statute of limitations for express and implied contractual claims.[17] We disagree for two reasons. First, unjust enrichment is a quasi-contractual claim, and while equitable in nature, those claims are subject to the six-year statute of limitations.[18] Second, even if the unjust enrichment claim were governed by the doctrine of laches, where an equitable cause of action is "analogous to the one at law," the laches consideration may "depend solely on the comparable statute of limitations."[19] Penn National's unjust enrichment and declaratory judgment claims are analogous to its contractual claim. All three claims seek to require North River to contribute to its costs indemnifying and defending Bittner. None of Penn National's arguments counsel against using the comparable six-year statute of limitations. Therefore, we believe the doctrine of laches would not support Penn National's equitable claims.[20]

---

[17] Unlike the statute of limitations, the time constraints of laches "are not fixed but are characteristically flexible." *Lavin v. Bd. of Educ. of Hackensack*, 447 A.2d 516, 519 (N.J. 1982). Courts may consider, among other things, "[t]he length of delay, reasons for delay, and changing conditions of either or both parties." *Id.* at 520.

[18] *Baer v. Chase*, 392 F.3d 609, 621–22 (3d Cir. 2004) ("[U]nder New Jersey law, non-personal injury actions involving monetary damages must be 'commenced within 6 years after the cause of any such action shall have accrued.' Moreover, there is no dispute between the parties that the six-year statute of limitations governs quasi-contract claims." (quoting N.J. Stat. Ann. § 2A:14-1) (internal citation omitted)).

[19] *Lavin*, 447 A.2d at 520 n.1.

[20] Because we conclude that all of Penn National's claims arising from the Helen Kramer landfill lawsuit are time-barred, we need not consider North River's second argument that the parties entered into a settlement relieving North River of any further obligations it had for indemnification of Bittner's costs in that lawsuit.

**III.**

Penn National argues that even if we agree that the District Court correctly determined that the statute of limitations expired with respect to recovery on the Helen Kramer landfill, the District Court erred by dismissing Penn National's claims because it could still recover indemnification and defense costs on the Buzby and BEMS landfills.

The District Court reasoned that Penn National's costs associated with the Buzby and BEMS landfills did not reach the per occurrence policy limits required to trigger coverage by North River. But Penn National argues that its 1982–83 policy also included a $500,000 aggregate limit, which it exceeded once its payment on the Helen Kramer landfill was allocated across the relevant policy years under *Owens-Illinois, Inc. v. United Insurance Co.* and *Carter-Wallace*.[21] Because the aggregate limit was exceeded, Penn National claims that it is owed contribution from North River for the Buzby and BEMS landfill payments.

The question of which policy form applied to Penn National's coverage of Bittner in the 1982–83 policy year was one of the two central issues in Penn National's 2012

---

[21] In *Owens-Illinois,* the New Jersey Supreme Court adopted the continuous trigger theory of liability for long-term exposure to asbestos. 650 A.2d 974, 993 (N.J. 1994). Under this theory, courts treat the exposure to the dangerous condition as an occurrence within an insurance policy and allocate the liability among insurance policies in proportion to the coverage limit set by the insurer in each policy year within the trigger period. *Id.* at 994. In *Carter-Wallace,* the New Jersey Supreme Court recognized that the continuous trigger theory applied to occurrences involving progressive environmental property damage. 712 A.2d at 1121. The court also explained that, where an insured has both primary and excess coverage, courts should use the total insurance coverage available in each policy year to allocate the damages across the trigger period and should then allocate costs to insurers within a policy year by reference to the limits set forth in each insurer's policy. *Id.* at 1124.

summary judgment motion. During discovery, Penn National conceded in interrogatories that policy form 73-3007 applied, a position echoed in the deposition of its senior claims examiner. However, in its opening brief, it attached an exhibit purporting to show that policy form GL9917, rather than form 73-3007, applied. The claims examiner then filed an affidavit, attached to Penn National's reply brief, explaining that the prior identification of form 73-3007 was in error and that form GL9917 applied. The District Court determined that the conflicting evidence created an issue of material fact that made summary judgment inappropriate.

Since then, another claims examiner later agreed that form GL9917 applied to the 1982–83 policy year. Nevertheless, we cannot say the District Court's decision was in error for two reasons. First, as North River points out in its briefing, complete copies of the policies could not be located by Penn National, and therefore it is possible that the endorsements Penn National points to are incomplete. Second, and more importantly, even if form GL9917 applies, it is unclear that Penn National's policy contained a $500,000 aggregate limit that would be relevant to the resolution of this case. The form explains that "such aggregate limit shall apply separately . . . with respect to each project away from premises owned by or rented to the named insured."[22] None of the landfills involved in this case were rented or owned by Bittner, and Penn National does not address, much less explain, this language in its policy form. Thus, there remain factual questions about the existence and effect of an aggregate policy limit that make summary judgment on this issue

_____

[22] A. 167.

inappropriate.

Accordingly, we affirm the District Court's denial of Penn National's motion for summary judgment. We note, however, the District Court did not address Penn National's legal arguments as to whether the payment for the Helen Kramer landfill should have been subjected to *Carter-Wallace* allocation, even though it is no longer recoverable, and whether that payment would have exhausted Penn National's aggregate policy limit, if such limit existed. While Penn National was not entitled to summary judgment, there may be a narrow path forward for recovery if it can show that it had an aggregate policy limit that applied to all of the landfills and that the payment toward the Helen Kramer landfill settlement exhausted its limits for the 1982–83 year. We therefore vacate and remand for the limited issue of North River's liability under *Carter-Wallace* for contribution toward the settlement of the BEMS and Buzby landfill claims.[23]

## IV.

For the foregoing reasons, we affirm in part and vacate and remand in part.

---

[23] On appeal, North River argued that Penn National abandoned its position on the Buzby and BEMS landfills at a conference before the District Court on July 7, 2017. We do not consider this point because the transcript of that conference is not part of the record; however, North River is free to raise the issue on remand.